Debra F. BROWN, Appellant,

v.

PATRIOT MAINTENANCE, INC.,
and Continental Insurance
Co., Appellees.

No. S–10955.

Supreme Court of Alaska.

Oct. 8, 2004.

---

James M. Hackett, Law Office of James M. Hackett, Fairbanks, for Appellant.

Constance E. Livsey and Jeffrey D. Holloway, Holmes Weddle & Barcott, Anchorage, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

This appeal challenges a decision by the Alaska Workers' Compensation Board denying disability benefits to Debra Brown, who claimed that she suffered from a disabling condition, fibromyalgia, that arose because she fell from a ladder at work. The board heard conflicting medical testimony—some finding that her condition probably stemmed from the fall and some finding no work-related causation—and decided that the testimony rejecting causation was persuasive. We affirm the board's decision, concluding that the board did not improperly fail to resolve doubt in Brown's favor and did not preclude meaningful appellate review by disregarding the lay testimony concerning causation.

## II. FACTS

While Debra Brown was working on a cleaning crew for Patriot Maintenance, Inc., her stepladder collapsed. She fell to the sidewalk, landing on the collapsed ladder with her hip and striking the sidewalk with her back, neck, and head. Brown was taken to the emergency room, where she reported having a headache and feeling pain in her hip, scapula, and neck. X-rays showed no fractures or other bone damage, and the emergency room physician found no evidence of acute injury apart from abrasions and bruises. The following week, Brown was examined by her primary care physician, Dr. Daniel Junck, who found a contusion (which seemed to be resolving) on Brown's right buttock and noted that Brown also had apparently suffered a cervical strain. Dr. Junck predicted that Brown would continue to improve but recommended that she wait another week before attempting to work, advising her to pursue light activities such as walking.

In the ensuing months, however, Brown's symptoms grew progressively worse, became

debilitating, and prevented her from resuming her job. Brown began to experience tenderness and pain radiating throughout her body; she also reported migraine headaches, lethargy, disturbed sleep, and feelings of depression with suicidal thoughts. She filed a claim for workers' compensation benefits, seeking temporary total disability.

In a followup examination about two months after the accident, Dr. Junck tentatively noted that Brown might have developed fibromyalgia syndrome. But in a separate evaluation requested by Patriot Maintenance, Dr. James Dinneen, an orthopedic surgeon, found "no objective evidence of any measurable impairment that can be attributed to the incident at this time." Although Dr. Dinneen confirmed that Brown had experienced a contusion on her right buttock and compression of her spine, he expected her symptoms from these injuries to resolve within thirty days. But during the next six weeks, Brown returned twice to Dr. Junck, complaining of continuing and still growing discomfort; Dr. Junck prescribed an antidepressant, directed Brown to remain off work, and ultimately diagnosed her condition as fibromyalgia.

Brown then underwent an independent medical evaluation by a panel of three physicians: Dr. G. DeAndrea, a neurologist, Dr. John E.Z. Caner, a rheumatologist, and Dr. Russell Vandenbelt, a psychiatrist. Dr. DeAndrea's report represented the consensus view of the panel. Although each panel member described the likely causes of Brown's symptoms from a differing medical perspective, the panel unanimously agreed with Dr. DeAndrea's conclusion that "Ms. Brown's present condition is strictly psychiatric" and that "there is no non-psychiatric condition or impairment as a result of [her on-the-job injury] other than as reported of right buttock contusion and abrasions, resolved, and without permanent partial impairment."

From his standpoint as a neurologist, Dr. DeAndrea reported that there was no objective evidence of neurologic impairment and found that Brown was fully employable. But he deferred to Dr. Vandenbelt for a precise psychiatric diagnosis.

Dr. Vandenbelt's psychiatric evaluation described Brown as suffering from major depression and perhaps a miscellaneous somatoform disorder. Dr. Vandenbelt saw no psychiatric reason why Brown could not perform her original job. Referring to Dr. Caner's finding (discussed below) of possible fibromyalgia, Dr. Vandenbelt observed: "[T]he array of physical and mental symptoms she presents with strikes me as more psychiatric than 'physical.'" Specifically, Dr. Vandenbelt summarized his view of Brown's condition as follows:

> It is likely she is overwhelmed with current emotional and psychological stressors related to her marriage, finances, and other difficulties at home with her children.... The occupational injury in question has provided a convenient focus for her concerns since it is easier for her [to] ask for care for physical concerns and symptoms than for emotional ones. The treatment she is in need of, however, is not because of any condition causally related to or aggravated by the occupational injury.

Dr. Caner, as a rheumatologist, believed Brown to be suffering from a general pain disorder that had characteristics of fibromyalgia but was not caused by industrial injury. He added that, in his view, "[e]pidemiologic studies have failed to demonstrate a causal relationship between accidental injuries and the subsequent development of fibromyalgia, although the association is frequently observed." After reviewing the results of Brown's most recent laboratory analysis, Dr. Caner noted that he found "no clear evidence of a pre-existing condition" and was "in full agreement with the discussion of Dr. DeAndrea." In the panel's unanimous view, then, Brown was "fully employable."

After receiving the panel's report, Patriot Maintenance controverted Brown's claim for ongoing benefits. The board ordered a second independent medical evaluation, referring the case to two additional physicians: Dr. Walter Ling, a neurologist and psychiatrist, and Dr. Stuart Silverman, a rheumatologist.

Dr. Ling endorsed the views expressed by the panel. He specifically agreed with Dr. DeAndrea that Brown's pain was not neurologically based—that she instead suffered from a pain disorder associated with psychological factors. While acknowledging that Brown's pain disorder apparently "arose within the context of her fall," Dr. Ling believed it unlikely "that the fall and the resulting soft tissue injury played a significant role in development of her pain disorder." In reaching this view, Dr. Ling carefully considered, but discounted, the likelihood of any causal relationship to Brown's accident:

> [Brown] seems convinced that the need for these changes stems from her fall injury. But from a medical perspective, it is much more likely that her background psychological make-up and her current life situation have much more to do with her conviction than do the consequences of her specific injury.

In Dr. Ling's view, then, Brown's accident was "not a substantial factor in causing her current condition." Moreover, Dr. Ling saw little need to attach a precise medical tag to Brown's condition, observing that, "whether or not her current diffuse pain condition is labeled as fibromyalgia, it is not medically probable that it is related to her specific fall."

By contrast, Dr. Silverman disagreed with the panel, concluding that Brown suffered from fibromyalgia and that this condition was probably work-related. While concurring with Dr. Caner's diagnosis of fibromyalgia, Dr. Silverman sharply disagreed with his view that current medical research fails to establish any causal link between traumatic injury and fibromyalgia. As Dr. Silverman saw the issue,

> What is in dispute is the relationship between [Brown's] traumatic injury on September 15, 1999, and her later development of fibromyalgia.

> I, myself, participated in the Vancouver Consensus Conference in June, 1994, (J. Rheum 1996, 23:3.) which stated that the development of fibromyalgia following a traumatic injury does not necessarily imply causation alone. . . .

What has been recently understood, and this has been reported in a second article, a minority report in the *Journal of Rheumatology:* 1997, 3:6, 324–27, is that patients who have a chronic persistent pain following a trauma may then go on, at a later time, to progressively develop widespread pain above & below the waist, consistent with fibromyalgia.

Upon reviewing their original reports in light of Dr. Ling's and Dr. Silverman's positions, the physicians comprising the original panel unanimously confirmed the panel's position and rejected Dr. Silverman's view of the case.

Specifically, Dr. DeAndrea refuted Dr. Silverman's interpretation of his report, emphasizing that the entire panel had agreed with the report and that Dr. Ling's report had independently confirmed the panel's findings. As for Dr. Silverman's criticism of the panel's failure to agree whether Brown suffered from a "pain disorder" or "somatoform disorder," Dr. DeAndrea observed: "Quite frankly in my opinion, there is no difference."

Dr. Caner similarly rejected Dr. Silverman's diagnosis and favored Dr. Ling's position. Warning that the distinction between psychogenic pain and fibromyalgia remains a controversial medical topic, moreover, Dr. Caner specifically challenged Dr. Silverman's interpretation of the conclusions reached by the Vancouver Consensus Conference; Dr. Caner insisted that, "since the necessary epidemiologic studies have not been performed," the Vancouver Conference's consensus view would attach to Brown's case and would compel the conclusion that her work injury was not a cause of her fibromyalgia.

Dr. Vandenbelt, too, stood by his prior evaluation. After pointing out several flaws in Dr. Silverman's report, Dr. Vandenbelt noted that his own view of the case remained "essentially unchanged."

Meanwhile, Brown had sought treatment from Dr. Lee Schlosstein, a physician specializing in internal medicine and rheumatology. Dr. Schlosstein found that Brown needed treatment for fibromyalgia and depression but ventured no opinion as to causation.

The board conducted an evidentiary hearing on Brown's claim for continuing disability benefits. In addition to considering the medical evidence described above, the board heard lay testimony presented by Brown. The board's decision summarized the lay evidence as follows:

> [T]he employee, her friends, family members and coworkers uniformly testified that before the fall, the employee was active, regularly playing racquetball and working out at the Fairbanks Athletic Club. She was a hard worker and had performed the majority of work required to complete the remodeling of their house. Since the date of injury, she has gained weight and become physically unable to engage in most of her prior activities. Her husband testified there "is no doubt" concerning the link between the employee's on-the-job injury and her current condition. He also presented a copy of *Understanding Post–Traumatic Fibromyalgia,* by Mark J. Pellegrino, which he believes helps document the relationship between the employee's trauma and her fibromyalgia condition. Rehabilitation counselor Robert Sullivan testified that he believes the employee cannot perform any jobs, other than "odd lot" jobs, in her current condition.

After reviewing all the evidence, the board denied Brown's claim. Finding the opinions of Drs. Vandenbelt, Caner, DeAndrea, and Ling to be most persuasive, the board concluded that Brown had failed to meet her burden of proving that her current condition was work-related.

The superior court affirmed the board's ruling, and Brown filed this appeal.

## III. DISCUSSION

Brown advances two main arguments, contending first that the board failed to resolve doubtful medical evidence in her favor and, second, that it failed to address her lay witnesses' testimony.

■ In an appeal from a decision entered by the superior court as an intermediate court of appeal, we directly review the board's ruling, without deferring to the superior court.[1] But our review of the board's decision is deferential. Alaska Statutes 23.30.122 gives the board "the sole power to determine the credibility of a witness"[2] and further gives the board conclusive power to evaluate "what weight to accord a witness' testimony, including medical testimony and reports, ... even if the evidence is conflicting or susceptible to contrary conclusions."[3] Hence, in reviewing a finding on compensability, we do not reweigh the evidence or choose among competing inferences; instead, we limit our review to determining whether substantial evidence supports the board's decision.[4] Substantial evidence exists when a reasonable mind viewing the record as a whole could accept a decision of non-compensability.[5] We have recently held that uncertainty within the medical community concerning the precise medical cause of a condition like fibromyalgia does not prevent the board from finding that a qualified physician's opinion on causation amounts to substantial evidence.[6]

We must decide Brown's points on appeal with these precepts in mind.

### A. Failure To Resolve Doubt in Brown's Favor

■ In contending that the board impermissibly failed to resolve doubt in her favor,

1. *Handley v. State,* 838 P.2d 1231, 1233 (Alaska 1992).

2. AS 23.30.122 provides:
   The board has the sole power to determine the credibility of a witness. A finding by the board concerning the weight to be accorded a witness's testimony, including medical testimony and reports, is conclusive even if the evidence is conflicting or susceptible to contrary conclusions. The findings of the board are subject to the same standard of review as a jury's finding in a civil action.

3. *Resler v. Universal Servs., Inc.,* 778 P.2d 1146, 1149 (Alaska 1989).

4. *Safeway, Inc. v. Mackey,* 965 P.2d 22, 27 (Alaska 1998) (citations omitted); *see also Bradbury v. Chugach Elec. Ass'n,* 71 P.3d 901, 905 (Alaska 2003).

5. *Safeway,* 965 P.2d at 27.

6. *Id.* at 28.

Brown cites *Beauchamp v. Employers Liability Assurance Corp.* for the proposition that "[i]f there is any doubt as to the substance of medical testimony, it must be resolved in favor of the claimant."[7] Brown then points to several supposed uncertainties that, she asserts, make this rule germane to her case: (1) the three rheumatologists who dealt with her case agreed that she suffers from "chronic pain/fibromyalgia" and that her fall caused or "could have caused" this condition; (2) Dr. Ling "conceded" that it was "not medically impossible" for a fall such as hers to cause fibromyalgia; (3) the board disregarded a book by a prominent rheumatologist supporting Brown's theory of causation; (4) Dr. Vandenbelt failed to physically examine her and never "definitively" diagnosed her condition; and (5) Drs. Schlosstein and Caner made certain statements during their testimony that arguably favored Brown's position.

Yet the rule for resolving doubt we mentioned in *Beauchamp* will not readily stretch to cover Brown's situation. The claimant in that case, Beauchamp, suffered continuing pain following back surgery and eventually filed a claim, attributing his back problems to a work injury predating his surgery that he had not previously reported.[8] The only medical testimony concerning causation was given by his surgeon, Dr. Mead, who reluctantly expressed equivocal and uncertain views as to the possible causes of Beauchamp's condition.[9] The board nevertheless found Beauchamp's claim compensable, relying principally on his own description of how his problems arose.[10] The superior court vacated the board's decision as unsupported, pointing to Dr. Mead's uncertainty as precluding a finding of probable causation.[11]

We reversed the superior court's decision and reinstated the board's award.[12] Though acknowledging that Dr. Mead was equivocal, we emphasized that the board was not restricted to or bound by this intrinsically uncertain expert testimony, since Beauchamp's lay testimony could also be considered to be substantial evidence supporting causation. We noted that the board could have "simply combined uncontradicted lay testimony with medical evidence which was in itself inconclusive, to reach a conclusion."[13] Examining the evidence as a whole, including the combined effect of Beauchamp's and Dr. Mead's testimony, we held that the record supported the board's conclusion.[14] And we noted in passing that "if there is any doubt as to the substance of medical testimony, it must be resolved in favor of the claimant."[15]

As applied in *Beauchamp*, then, the rule requiring doubt to be resolved in the claimant's favor served to confirm the board's broad fact-finding discretion and to narrow a reviewing court's authority to reweigh the board's evidentiary determinations. But here, by contrast, Brown paradoxically seeks to invoke the rule for the opposite purpose: she urges us to reverse the board's decision, and thereby narrow its factfinding authority, by combing the record for signs of doubt that the board itself did not consider important. Applying the rule in this way would defeat *Beauchamp's* basic purpose.

*Beauchamp* is distinguishable for another important reason. In *Beauchamp* we dealt with a case involving uncertainties arising from a single expert witness's equivocal testimony. Unlike the record in *Beauchamp*, the record here includes the testimony of multiple medical experts who gave unequivocal opinions rejecting causation. Here, each of the medical reports the board found persuasive unequivocally expressed the opinion that Brown's condition probably was not caused by her injury; when viewed individually, then, each of these reports unquestionably

---

7. 477 P.2d 993, 997 (Alaska 1970) (citing *Thornton v. Alaska Workmen's Comp. Bd.,* 411 P.2d 209, 211 & n. 7 (Alaska 1966)).

8. *Beauchamp,* 477 P.2d at 993–94.

9. *Id.* at 995.

10. *Id.* at 994.

11. *Id.*

12. *Id.* at 996.

13. *Id.*

14. *Id.* at 997.

15. *Id.* (citing *Thornton,* 411 P.2d at 211 & n. 7).

presented the board with substantial evidence against finding causation.[16] Brown thus seeks to stretch the rule of doubt beyond its original scope. She effectively insists that the rule should apply not just to intrinsic doubt emerging from a single witness's equivocal opinion, but to all doubts generated by conflicting medical testimony. As Patriot Maintenance correctly responds, a conflict between divergent medical views simply "reveals a difference in firmly held medical opinion." In prior decisions we have expressly recognized that this form of "doubt" lies beyond reach of the doubt-rule applied in *Beauchamp*.[17] The rule requiring doubt to be resolved in the claimant's favor does not extend to Brown's situation.

But even if it applied to doubts generated by conflicting testimony, and even if it could be used to restrict, rather than expand, the board's factfinding authority, the rule requiring doubt to be resolved in the claimant's favor would not assist Brown, since the evidentiary problems she raises create no significant doubt. Because the determination of medical causation hinges on medical probability, not medical certainty,[18] evidence suggesting that Brown's fall "could have caused" her condition or that a causal link was "not

medically impossible" does nothing to undermine the board's finding on causation. Dr. Ling cogently made this point in responding to a letter questioning his "concession" that a causal link was not impossible: "I do not think we are talking about possibilities. What I was expressing [in the report] were medical probabilities. It would be impossible to say something is 'impossible.'"

Similarly, neither Dr. Vandenbelt's failure to physically examine Brown nor his reluctance to attach a definitive medical label to her condition creates any significant basis for doubting his views. As the psychiatric member of a three-physician panel that included a neurologist and a rheumatologist, Dr. Vandenbelt could reasonably choose to rely on his colleagues to perform the physical part of Brown's examination. And as demonstrated by his report and our case law, his reluctance to attach a definitive name to Brown's condition is substantively inconsequential.[19]

Furthermore, any possible doubt implicit in the passages of testimony that Brown attributes to Drs. Schlosstein and Caner could have had no significant bearing on the potential weight of their overall views.[20]

And no serious doubt can arise from the board's failure to specifically discuss views

---

**16.** *See, e.g., Big K Grocery v. Gibson*, 836 P.2d 941, 942 (Alaska 1992) ("It has always been possible to rebut the presumption of compensability by presenting a qualified expert who testifies that, in his or her opinion, the claimant's work was probably not a substantial cause of the disability."); *Safeway*, 965 P.2d at 28 (holding that uncertainty concerning the ultimate cause of fibromyalgia does not defeat an expert's opinion on causation, and affirming the board's denial of benefits based on physician's opinion finding traumatic injury probably has no causal link to later fibromyalgia).

**17.** *See, e.g., Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1048 (Alaska 1978) ("Miller's survivors apparently would have us apply the rule whenever the evidence reveals lack of unanimity or shows uncertainty among medical experts about ultimate causation. We are not persuaded that the rule should be applied in [this] manner.").

**18.** *Safeway*, 965 P.2d at 28.

**19.** For example, we stressed in *Beauchamp*, 477 P.2d at 996, that, "[i]n determining causation, exact medical certainty is not required." *Compare, e.g., Black v. Universal Servs., Inc.*, 627 P.2d

1073, 1075–76 & n. 9 (Alaska 1981) (finding that a "reasonable mind" would not accept diagnosis when physician had no opportunity to examine Black in any depth), *with Palmer v. Municipality of Anchorage, Police & Fire Retirement Bd.*, 65 P.3d 832, 846 (Alaska 2003) (limiting *Black* to situations where reviewing physician's statement stands alone and is inconsistent with other evidence); *cf. Steffey v. Municipality of Anchorage*, 1 P.3d 685, 692 (Alaska 2000) (observing that "it is not our role to reweigh the evidence" simply because medical experts "were not absolutely certain that work was not a substantial factor in [claimant's] injury").

**20.** Although her argument on this point is unclear, Brown evidently finds conflict between Dr. Schlosstein's observation that depression is commonly associated with fibromyalgia and Dr. Caner's testimony (agreeing with Dr. Silverman's view) that he had seen no evidence that Brown suffered from any significant emotional problem before her accident. The materiality of this conflict is far from apparent: Dr. Schlosstein attached no particular significance to the association between fibromyalgia and depression, and Dr. Caner's testimony that he had seen no evidence of prior depression was specifically limited to evidence existing in Brown's medical records.

expressed by Dr. Mark J. Pellegrino in his book *Understanding Post–Traumatic Fibromyalgia*[21]—passages of which were submitted during the testimony of Brown's husband. Contrary to Brown's assertions, the board's decision did not disregard this book. As mentioned already above, the board expressly acknowledged that selected passages of the book had been filed, and summarized their general content, which describes case studies suggestive, in Dr. Pellegrino's view, of a strong association between the onset of fibromyalgia and physical trauma. But these views do not purport to apply to the particular facts of Brown's claim. Furthermore, other readily accessible publications disagree with Dr. Pellegrino's views;[22] the experts who actually testified at Brown's hearing generally acknowledged that the existence of a causal association between trauma and fibromyalgia—the major assertion of Dr. Pellegrino's book—remains controversial and eludes definitive proof; and Dr. Pellegrino's position on this issue essentially parallels the views forcefully—and much more specifically—advocated by Dr. Silverman. Given these circumstances, Dr. Pellegrino's book was cumulative at best and did not require more specific discussion.

For all these reasons, we reject Brown's claim that the board erred in failing to resolve doubt in her favor.

## B.  Failure To Discuss Lay Testimony

■ Brown's second major claim is that the board erred by focusing solely on the medical evidence of causation and disregarding the testimony by Brown, her husband, and other lay witnesses who supported her claim of causation.

Preliminarily, we note that Brown is mistaken in suggesting that the board ignored her lay evidence. As we have already noted above, the board's decision expressly acknowledged and summarized the lay testimony. Although the board did not analyze this testimony in its findings and conclusions, its summary belies Brown's claim that the board "simply disregard[ed]" this evidence.

More important, our cases did not require the board to discuss the lay evidence at length in deciding this case. Brown builds her claim of error on two cases, *Ayele v. Unisea, Inc.*,[23] and *Stephens v. ITT/Felec Services*.[24] Neither supports her position. Our opinion in *Ayele* usefully illustrates this point by describing and narrowing the relevant holding in *Stephens*.

*Ayele* dealt with a former Unisea worker, Ayele, who claimed to have been injured on the job by exposure to ammonia, asserting that this exposure caused injuries that progressed into a debilitating mental illness after he ended his employment.[25] At his hearing before the board, Ayele and Unisea agreed that Ayele was disabled but disagreed as to the disability's cause.[26] Unisea relied on a three-physician panel that found no work-related causation.[27] Ayele relied on his treating physician and attempted to bolster his claim with four lay witnesses—relatives and friends who had seen him soon after his alleged exposure and who described his complaints, conduct, and visible symptoms in a way that supported Ayele's account of his original injury.[28] The board rejected Ayele's claim, finding Unisea's medical evidence to be more persuasive than his.[29] In explaining its decision, the board extensively discussed

**21.** Anadem Pub. Co. (1996).

**22.** *See, e.g.,* Gardner, *Fibromyalgia Following Trauma: Psychology or Biology?, Current Review of Pain* (U.Wash.2000) ("[T]he current state of the literature does not allow the conclusion that trauma and fibromyalgia are causally associated."); *compare Fibromyology Consensus Conference Report, Journal of Rheumatology* 23:3 (1996), *with Fibromyalgia Consensus Report: Additional Comments, Journal of Rheumatology* 3:324–27 (1997).

**23.** 980 P.2d 955 (Alaska 1999).

**24.** 915 P.2d 620 (Alaska 1996).

**25.** *Ayele,* 980 P.2d at 955–56.

**26.** *Id.* at 956.

**27.** *Id.*

**28.** *Id.*

**29.** *Id.* at 956–57.

the medical evidence but completely failed to discuss Ayele's lay witnesses.[30]

On appeal Ayele raised a single point: relying on *Stephens*, he claimed that the board erred by disregarding his lay witnesses's testimony.[31] We rejected this argument, observing that Ayele "mistakenly assumes that the lay-witness testimony in this case is potentially material to the Board's decision."[32] In explaining this conclusion, we began by distinguishing Ayele's case from the circumstances in *Stephens*:

> There, an injured worker, Stephens, sought compensation for a heart attack that he had suffered while working at a remote job site. Several medical experts testified that the heart attack was not work related. The experts had only limited information about the actual work conditions under which Stephens's heart attack occurred, and they expressly based their opinions as to work-relatedness on various assumptions concerning those work conditions. Although Stephens presented lay-witness testimony tending to undermine these assumptions, the Board adopted the experts' opinions and denied Stephens's claim without even mentioning his witnesses.[33]

While acknowledging that the lack of express findings concerning the lay testimony required us to order a remand in *Stephens's* case because we were unable to review the disputed decision without knowing how the board viewed Stephens's lay-witness testimony, we stressed in *Ayele* that this ruling in *Stephens* hinged on the lay testimony's highly material role under the particular facts there disputed:

> [W]e by no means held [in *Stephens*] that the Board must discuss all lay-witness testimony touching on a disputed issue. Instead, we relied on the specific nature of the evidence that the Board's decision failed to address and its peculiar relevance to the issue actually contested: whether Stephens's work environment caused or

contributed to the heart attack—which undisputably occurred at work and resulted in his injuries—or whether the attack resulted from his preexisting physical condition. Thus, our decision requiring the Board to address Stephens's lay-witness testimony simply recognized the "potential materiality" of that testimony in the specific factual setting of Stephens's case.[34]

Applying *Stephens's* rationale to the circumstances presented in *Ayele*, we concluded that the board did not err in failing to mention Ayele's lay testimony under the particular facts at issue there, since that testimony would not have been material:

> In this case, the lay-witness testimony bears little relevance to the Board's ultimate finding of lack of causation. The lay witnesses testified about Ayele's statements, appearance, and treatment by Unisea during the months immediately following the August 31, 1991, incident, describing him as consistently complaining of exposure to ammonia and of headaches, nosebleeds, and vomiting. At most, these accounts supported Ayele's theory of causation by tending to confirm that during that period Ayele had in fact been exposed to ammonia.
>
> The medical experts did not seriously question that Ayele had made the complaints described by his lay witnesses, or even that he might have been exposed to ammonia. They did question whether Ayele's complaints had been corroborated by any objective medical observations. But the lay-witness testimony sheds little light on this issue. Moreover, the issue of Ayele's condition in 1991 is itself of minor importance. Despite Ayele's assertions to the contrary, the experts' ultimate opinions concerning Ayele's present condition did not hinge on assumptions concerning the August 1991 incident. Rather, they drew on years of medical history and on recent, thorough examinations of Ayele.
>
> . . . .

---

30. *Id.*

31. *Id.* at 957.

32. *Id.*

33. *Id.* (footnotes omitted).

34. *Id.*

Because the lay-witness testimony merely supported Ayele's claim of past exposure to ammonia and did not cast doubt on the validity of the expert testimony which the Board accepted, the Board's failure to mention those witnesses in its decision denying benefits does not preclude meaningful appellate review.[35]

Comparing *Ayele* and *Stephens* to the circumstances at issue here, we think that Brown's case falls decidedly closer to *Ayele* than *Stephens*. Here as in *Ayele*, the existence of an initial work-related physical injury was not in dispute. And also as in *Ayele*, it was undisputed here that the evidence established an apparent temporal link between the initial work-related injury and a more serious, progressively developing condition; and in both cases, too, the existence of the more serious condition was not contested. The controversy centered primarily on the condition's likely *medical* causes.

Just as it did in *Ayele*, then, the lay testimony here strongly corroborated the claimant's contentions that a serious condition currently existed and appeared to be temporally linked to the original work-related occurrence. And in both cases the medical experts largely accepted these points. But here as in *Ayele*, the medical experts nonetheless disagreed on causation, grounding their opinions on medical observations that the lay testimony realistically could not have addressed.

Thus, despite Brown's claim to the contrary, the lay witness evidence here did not materially erode the medical opinions of the physicians whose testimony the board chose to accept. Unlike the record in *Stephens*, the record here fails to suggest that Drs. DeAndrea, Caner, Vandenbelt, or Ling—either individually or collectively—relied on any significant factual assumptions that the lay testimony might have refuted or altered. To the contrary, the lay witnesses described facts that the experts had already received—and for the most part accepted. Brown and her husband testified about matters that Brown had repeatedly covered in the course of her many prior medical interviews—virtually all of which the medical panelists had

studied. Other lay witnesses mainly bolstered the testimony presented by Mr. and Mrs. Brown. On the whole, then, the lay evidence contained few surprises and was not controversial. Just as they did in *Ayele*, the medical experts here keyed their divergent opinions on the differing medical inferences they drew from a fairly settled record of facts.

Since our review of the record fails to convince us that the lay testimony here was "material" in the sense described by *Ayele* and *Stephens*, we conclude that the board's summary of this evidence suffices and that more elaborate discussion was not needed to give us a meaningful basis for appellate review.

## IV.   CONCLUSION

Because we conclude that the board's decision is adequately explained and finds support in substantial evidence, we AFFIRM the board's order denying Brown's claim.