NOTICE

*Memorandum decisions of this court do not create legal precedent.  A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| LINDA S. ROCKSTAD, ) | |
| ) | Supreme Court No. S-14092 |
| Appellant, ) | |
| ) | Alaska Workers' Compensation |
| v. ) | Appeals Commission No. 10-088 |
| ) | |
| CHUGACH EARECKSON ) | MEMORANDUM OPINION |
| SUPPORT SERVICES, ZURICH ) | AND JUDGMENT* |
| AMERICAN INSURANCE ) | |
| COMPANY, and NOVAPRO RISK ) | No. 1405 – January 18, 2012 |
| SOLUTIONS, ) | |
| ) | |
| Appellees. ) | |
| ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission, Laurence Keyes, Chair.

Appearances:  Linda S. Rockstad, pro se, Palmer, Appellant. Robert J. Bredesen, Russell, Wagg, Gabbert & Budzinski, Anchorage, for Appellees.  Erling T. Johansen, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for State of Alaska.

Before:  Carpeneti, Chief Justice, Fabe, Winfree, Christen, and Stowers, Justices.

---

\*      Entered pursuant to Appellate Rule 214.

## I.   INTRODUCTION

A worker alleged that her work caused or exacerbated wrist and elbow conditions. Her employer initially paid workers' compensation benefits but later filed a controversion based on medical opinions that the employee should have recovered from any work-related injury she suffered. After a hearing, the Alaska Workers' Compensation Board found that the employee did not prove her claim by a preponderance of the evidence. The Alaska Workers' Compensation Appeals Commission affirmed the Board's decision, concluding that substantial evidence in the record supported the Board's decision. We affirm the Commission's decision.

## II.   FACTS AND PROCEEDINGS

Linda Rockstad began to work for Chugach Eareckson Support Services (CESS) on Shemya Island in August 2002. She worked at various positions, including food service and data entry. Her schedule was three months on the island, then three weeks off. Before working for CESS, Rockstad worked at a variety of jobs, including customer service work at Alaska Cleaners and janitorial work at Fred Meyer. When she worked at Alaska Cleaners, Rockstad filed a workers' compensation claim for de Quervain's tenosynovitis in her left wrist.[1] This claim was ultimately resolved in 2000 through a compromise and release (C & R). Although the medical records from that time note a similar condition in Rockstad's right wrist, the C & R indicated that Alaska Cleaners disputed whether her right wrist pain was work related.

In February 2003 Rockstad went to the Shemya clinic for elbow pain. She complained of right elbow pain when lifting dishes at work; she also indicated that she had recently begun lifting weights for exercise. The clinic diagnosed right lateral

---

[1]    De Quervain's tenosynovitis is a condition that causes pain due to entrapment or constriction of tendons in the part of the wrist near the thumb. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 481, 1070 (28th ed. 1994).

epicondylitis (tennis elbow), gave her a tennis elbow strap and a short-term prescription for naproxen, and advised her to discontinue weightlifting for two weeks. The record contains no other chart notes from the Shemya clinic for elbow pain.

Rockstad changed work assignments in April 2003 from dishwashing to data entry. The following month Rockstad went to the Shemya clinic for right wrist pain. Her diagnosis was right wrist de Quervain's tenosynovitis; the healthcare provider prescribed naproxen and ice packs, and also discussed other possible treatments with her. In early August 2003 Rockstad returned to the clinic because her wrist pain had increased and was "inhibiting her sleep." The healthcare provider again diagnosed right wrist de Quervain's tenosynovitis and noted that Rockstad's work exacerbated the condition. The healthcare provider prescribed medication, advised her to follow up with an orthopedist, and sent her medical record to CESS's workers' compensation insurance company for evaluation. Rockstad reported feeling much better because of the medication.

In September 2003 CESS filed a report of injury form with the Alaska Workers' Compensation Board for the right wrist pain. Also in September 2003, Rockstad consulted with Charles Kase, M.D., an orthopedist who had performed surgery on her left wrist in 1999. He prescribed Motrin and a wrist splint and advised her to come back to see him when she returned to Anchorage. Dr. Kase also referred Rockstad to occupational therapy, which she attended until September 15, 2003. Rockstad did not return to treatment with Dr. Kase until July 2004.

Rockstad quit her job with CESS in April 2004 and began to work for Nye Toyota in Anchorage the following month as a payroll clerk. She quit her job with Nye after about two months, reportedly because of wrist pain. Rockstad testified that she did not have any on-the-job injuries while at Nye. Rockstad went to the emergency room

for wrist pain on June 28, 2004; the doctor who saw her noted that she could not see Dr. Kase for a week.

Rockstad had surgery on her right wrist in July 2004. The hospital chart notes showed that Dr. Kase did a partial release of her carpal ligament (for carpal tunnel syndrome) and a release of her right first dorsal wrist compartment (for de Quervain's tenosynovitis); he also injected her elbow with medication. In February 2005, Rockstad sought care from George Siegfried, M.D., complaining that the surgery did not alleviate her pain. He referred her to Michael McNamara, M.D. Dr. McNamara eventually performed another surgery in May 2005; the surgery consisted of a right lateral epicondylectomy and another dorsal compartment release on her right wrist.

Before the surgery, Dr. McNamara referred Rockstad to Joella Beard, M.D., a physiatrist then practicing with Advanced Sports Medicine & Rehab. Dr. Beard recommended that Rockstad begin psychiatric treatment for possible depression and noted possible symptom magnification for Rockstad's de Quervain's condition. Rockstad was seen by Lois Michaud, Ph.D., and Connie Judd, a psychiatric nurse practitioner, for depression and pain disorder. In September 2005 Rafael Prieto, M.D., another physician with Advanced Sports Medicine & Rehab,[2] prepared a permanent partial impairment (PPI) rating for Rockstad; he found that she was medically stable and evaluated her as having an eight percent whole person impairment.

In October 2005 Dr. McNamara again referred Rockstad to Dr. Beard, this time for vocational rehabilitation assistance. Dr. Beard saw Rockstad on December 15 and prescribed aquatic therapy. In her dictation from that visit, Dr. Beard thought that Rockstad's "disability [was] greater than would be expected" and noted that Rockstad's

---

[2]    Dr. Prieto assumed the care of Dr. Beard's patients after Dr. Beard left Advanced Sports Medicine & Rehab for another practice.

request for a handicap sticker might "suggest psychological overlap." Dr. Beard predicted, however, that Rockstad would have a permanent partial impairment as a result of the injury at CESS, so the reemployment benefits administrator found Rockstad eligible for reemployment benefits.[3] Dr. Beard later wrote that Rockstad's disability level exceeded her medical condition. Dr. Beard thought that "[Rockstad's] primary diagnosis likely includes major depression," which was not "exclusively related to the claimed event." During the same time period, Rockstad also saw Gregory Polston, M.D., for pain management, on referral from Dr. Prieto. Dr. Polston considered the possibility that Rockstad had a scar neuroma from her surgeries.[4]

Dr. McNamara's chart notes indicated that Rockstad initially did well after the May 2005 surgery, but in November 2005, after Rockstad had written and questioned some of his chart notes, Dr. McNamara asked her to find another treating physician.

After Dr. Beard suggested an independent medical evaluation, CESS arranged an employer's independent medical evaluation (EIME) with a panel of physicians in February 2006. The panel consisted of three physicians: Stephen Fuller, M.D., an orthopedic surgeon; Gerald Reimer, M.D., a neurologist; and S. David Glass, M.D., a psychiatrist. Dr. Glass diagnosed a "somatoform pain disorder," which he did not attribute to Rockstad's work at CESS. Dr. Glass did not think that any of Rockstad's psychiatric diagnoses were attributable to her work at CESS, nor did he think that Rockstad needed psychiatric treatment as a result of her work injuries. Dr. Fuller and Dr. Reimer submitted a joint report; they concluded that Rockstad had "a temporary transient exacerbation of pre-existing de Quervain's symptoms" for about a month while

---

[3] Dr. Beard was evidently unaware of Dr. Prieto's PPI rating.

[4] A scar neuroma is a mass of nerve fibers that can arise after a nerve is cut or suffers other trauma. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1130 (28th ed. 1994).

she worked for CESS.[5]  The panel noted a "fake bad" response to one test Dr. Fuller performed; the panel also interpreted some of the test results in earlier medical records as "fake bad."  After receiving the panel's reports, CESS controverted all of Rockstad's benefits.[6]  CESS also sent a copy of the EIME reports to Dr. Beard, who indicated that she agreed with the panel's opinions.

In April 2006 Rockstad went to Florida for a period of time.  CESS claimed that Rockstad moved to Florida because Rockstad told two of her healthcare providers in early 2006 that she was moving out of state and she asked one provider for a copy of her medical records before she left.  But according to Rockstad, she went to Florida for a friend's wedding, intended to be gone only about a month, but developed an illness that required several weeks of hospitalization and was not able to return to Alaska until early August.  While she was in Florida, Rockstad spent time with a friend on a sailboat in the Bahamas and developed a skin infection.  The infection was treated with antibiotics, but it worsened and Rockstad was hospitalized in Florida for about three weeks due to an abscess in her neck.  She underwent two surgical procedures to drain the abscess and she developed complications.  CESS relied on the Florida hospital records to argue that Rockstad was magnifying her wrist and elbow symptoms because the Florida hospital notes do not mention pain complaints related to her right arm and do not document difficulties with using her right hand.  Rockstad apparently did not seek treatment in

---

[5]    CESS apparently did not initially provide the panel members with the chart note from Rockstad's first visit to the Shemya clinic for wrist pain:  the panel's report said the first visit happened on August 4, 2003, but the first visit for wrist pain was in May 2003.

[6]    At the time of controversion, Rockstad was receiving reemployment benefits of $639.47 per week.  CESS separately controverted reemployment benefits because of non-cooperation, saying that Rockstad had "fail[ed] to maintain contact with the rehabilitation specialist."

Florida for her right wrist and arm complaints but Rockstad's friend, William May, testified that Rockstad's arm caused her pain and limited her activities throughout the time she spent with him in Florida.

Rockstad returned to Alaska in August 2006. She restarted treatment for her arm and wrist pain and for depression in mid-August. She resumed treatment with Connie Judd and began to see Jon Hinman, M.D., a pain doctor in the same practice. Rockstad applied for Social Security disability benefits in November 2006, and her application was approved in February 2007. Social Security decided that she became disabled under its rules in June 2004; her primary disabling diagnosis was affective or mood disorders.

Mary Thoeni, a non-attorney advocate, entered an appearance for Rockstad in her workers' compensation case in December 2006. On December 20, 2006, Rockstad filed a written workers' compensation claim seeking temporary total disability (TTD) from August 4, 2003 and continuing; PPI; medical and transportation costs; a review of her reemployment benefits decision; penalties and interest; unfair or frivolous controversion; and legal costs. She claimed a repetitive motion injury to her right hand, wrist, and elbow that caused continuing pain, swelling, and tingling. She also claimed that she had an "injury-related mood disorder."

CESS deposed Rockstad on December 14, 2006. Rockstad testified that she was unable to raise her right arm to take the oath before testifying because of her arm pain and that the "inability to raise [her] arm" had been "ongoing since [her] injury" and had been "24/7." She testified that she had difficulty dressing herself and that she could not use her right hand to take caps off bottles because of pain. Rockstad said that her pain at the time of the deposition was "[a]bout the same" as the pain she had two days earlier, on December 12, when she went to a prehearing conference. She rated her pain at the time of the deposition as "[n]ine and a half" on a scale of ten. Rockstad testified

that she would not be able to hold a 12-ounce paper cup full of coffee and that she had not been able to use her right hand while driving to the deposition that morning. Rockstad asked that the deposition end early because she was in too much pain.

Unbeknownst to Rockstad, CESS videotaped her after the prehearing conference on December 12 and after the deposition on December 14. The videos showed her engaging in a variety of activities, including using her right hand to get merchandise from a shelf that was above shoulder height, adjusting her car's rearview mirror with her right hand, carrying a bag of groceries with her right hand, and using her right hand while driving. She also used her right hand to help support a full case of soda, momentarily, when she placed the soda in her car after purchasing it. An earlier video from January 2006 showed her using both arms to carry several boxes from the post office to her car.

Rockstad's deposition resumed on March 9, 2007. She testified that after the deposition ended on December 14, she took Ms. Thoeni home and then went home and went to bed; she said her pain did not improve that day.

In early 2007 Dr. Hinman treated Rockstad for scar neuromas in her right arm. In January 2007 he diagnosed her for the first time with complex regional pain syndrome (CRPS), type II.[7] In May 2007 Dr. Hinman referred Rockstad to another orthopedic surgeon, Douglas Vermillion, M.D., for evaluation and treatment of medial epicondylitis (golfer's or bowler's elbow)[8] and a possible ganglion cyst in her right

---

[7]    According to Dr. Fuller, complex regional pain syndrome is "basically, complaints of pain." A CRPS, type II diagnosis requires some type of injury to the nerve. AMERICAN MEDICAL ASS'N, GUIDES TO EVALUATION OF PERMANENT IMPAIRMENT 451 (6th ed. 2008). Dr. Beard considered but rejected a CRPS diagnosis earlier in Rockstad's care.

[8]    Rockstad first complained of medial epicondylitis in August 2005, while
(continued...)

wrist.[9] Dr. Vermillion referred Rockstad for electrodiagnostic evaluation to rule out neuropathy. The examiner found no evidence of neuropathy. Dr. Vermillion considered surgery for her elbow, but told Rockstad that she had to quit smoking first because smoking interfered with one of the treatments he planned to use.

Dr. Hinman ordered an ultrasound of Rockstad's right wrist, which showed a small ganglion cyst. He continued to treat Rockstad for pain complaints, including a nerve block, which reportedly reduced Rockstad's pain considerably for about two days. An MRI of Rockstad's right wrist confirmed a small ganglion cyst, and an MRI of her elbow "suggest[ed] tendinosis."

Dr. Vermillion performed surgery on Rockstad's wrist and elbow on September 2, 2008. He removed the ganglion cyst and performed a de Quervain's release and a lateral epicondyle release. He also injected platelet gel into her elbow and wrist to help the tendons heal. He did not observe any abnormality in the elbow tendon, but he testified that this was not unusual because many tears that cause pain are microscopic. According to Dr. Vermillion, he opened a larger incision on her right wrist than Dr. McNamara had and released a tendon that probably had not been released before.

The Board ordered a second independent medical evaluation (SIME) in April 2008. Two doctors evaluated Rockstad: Christopher Wilson, M.D., an orthopedic surgeon; and Walter Ling, M.D., a neurologist and psychiatrist. Neither of the SIME physicians was provided a copy of the surveillance videos at the time of their examinations of Rockstad; the videos had not yet been properly authenticated.

---

[8]    (...continued)
treating with Dr. McNamara. Medial epicondylitis causes pain on the inside of the elbow.

[9]    A ganglion cyst is filled with synovial fluid.

Dr. Wilson concluded that Rockstad had several work-related conditions: "first dorsal compartment tendinitis of the right wrist," right elbow lateral and medial epicondylitis, "sensory radial neuritis in the right wrist and hand," and CRPS. He did not attribute the ganglion cyst to her work. Dr. Wilson thought that Rockstad had reached medical stability on January 2, 2009, four months after Dr. Vermillion's surgery.

Dr. Ling saw Rockstad on June 30, 2009. He thought Rockstad had a work-related psychiatric condition "to the extent that her psychiatric symptoms [were] related to her emotional response" to her physical complaints and the workers' compensation process. Dr. Ling summarized Rockstad's medical records in some detail. He found "no evidence of a neuroma." He also said that while Rockstad might "have had symptoms of a complex regional pain syndrome at some point," there was no evidence of it at the time of his examination. Dr. Ling diagnosed Rockstad with adjustment disorder with mixed anxiety and depressed mood.

Two of the EIME physicians wrote supplemental reports. Dr. Glass wrote that, in his opinion, Rockstad was malingering based on his review of the surveillance videos and Rockstad's deposition; he restated his opinion that Rockstad did not have a psychiatric condition that could be attributed to her work at CESS. Dr. Fuller summarized additional medical records from Rockstad's left wrist injury in 1999, noting that she had a similar presentation then, including concerns about symptom magnification. He reviewed the video depositions and the surveillance videos and concluded that Rockstad was malingering. Dr. Fuller said that it was "not medically probable" that Rockstad's ganglion cyst caused her pain. He described her pain as "nonorganic" and noted that her diagnoses "were largely based on her subjective protestations of pain."

The Board held a hearing on Rockstad's claim in September 2009. The Board had an abundance of deposition testimony, but only three witnesses appeared at

the hearing: Rockstad, Dr. Fuller, and Dr. Glass. Rockstad testified about her injury and her medical treatment. She testified about the various medications she was taking at the time of the EIME, her depositions, and the hearing. She also testified about the side effects of the medications. In her prehearing memorandum, Rockstad claimed that the surveillance videos had been edited and that their quality was so poor that it was "not possible to see her facial expressions." At the hearing Rockstad testified that she was wearing a brace when the December 12, 2006 video was made. She also said that her pain waxed and waned in 2006.

Dr. Fuller testified consistently with his report. He discussed the different medical diagnoses that Rockstad had received. Based on Dr. Kase's chart notes from 1999 to 2000, Dr. Fuller testified that Rockstad had preexisting de Quervain's tenosynovitis in her right wrist. According to Dr. Fuller, de Quervain's syndrome is permanent when it lasts longer than a year; a four-year history of intermittent right wrist pain would be enough to make it permanent. Based on his review of the surgical notes, Dr. Fuller concluded that Dr. McNamara "did the correct surgery" on Rockstad's right wrist. Dr. Fuller testified that Rockstad's work activities "caused the symptomatic flare of an already chronic condition" and "that particular symptomatic flare-up would have ended when she stopped coming for medical treatment." He also stated that if Rockstad continued to have problems until she left Shemya Island, even if she did not seek treatment, her wrist symptoms could be attributed to her work. Dr. Fuller indicated that Rockstad would have symptoms that waxed and waned until she had a surgical release and that Dr. McNamara did a "classic surgery for this." He also discussed his impression that Rockstad's presentation at the EIME was not forthright and explained why he thought she was embellishing her symptoms at other times.

Dr. Glass also testified consistently with his report. He explained the different psychiatric diagnoses used by various doctors in Rockstad's case and also

explained why he changed his diagnosis of Rockstad's condition to malingering and distinguished malingering from a somatoform disorder.

The Board issued its decision on December 16, 2009. After summarizing the testimony and medical records, it looked at each claimed medical condition and analyzed whether Rockstad's work at CESS was a substantial factor in causing the condition. It decided that Rockstad failed to prove by a preponderance of the evidence that her work with CESS was a substantial factor in causing a mood disorder, any neurological injury, the ganglion cyst, or the right medial epicondylitis (golfer's or bowler's elbow). It decided that her work at CESS caused a temporary exacerbation of her de Quervain's tenosynovitis which resolved by September 2003. It also decided that any right lateral epicondylitis (tennis elbow) that arose from her work with CESS resolved before she left Shemya Island. The Board rejected the remainder of Rockstad's claims.

Rockstad moved for reconsideration. The Board denied reconsideration in a written decision. Rockstad appealed both decisions to the Commission. The Commission affirmed the Board, finding that substantial evidence in the record supported the Board's decisions. Rockstad appeals.

## III.   STANDARD OF REVIEW

In a workers' compensation appeal from the Commission, we review the Commission's decision.[10] We independently review the Commission's conclusion that substantial evidence in the record supports the Board's findings, which "requires us to independently review the record and the Board's factual findings."[11] We interpret the

---

[10]   *Shehata v. Salvation Army*, 225 P.3d 1106, 1113 (Alaska 2010) (citing *Barrington v. Alaska Commc'ns Sys. Grp., Inc.*, 198 P.3d 1122, 1125 (Alaska 2008)).

[11]   *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

pleadings of pro se litigants less stringently than those of lawyers.[12] And we apply our independent judgment to questions of constitutional law.[13] Statutes are presumed to be constitutional, and the burden of showing that they are unconstitutional is on the party challenging the statute.[14]

## IV. DISCUSSION

### A. The Commission Correctly Concluded That Substantial Evidence Supported The Board's Decision.

"The Alaska Workers' Compensation Act creates a presumption that an employee's claims are compensable."[15] The presumption analysis has three steps.[16] To attach the presumption that her claim is compensable, the employee has to establish a link between her injury and her employment.[17] If the presumption attaches, "the employer may rebut the presumption by presenting substantial evidence that (1) provides an alternative explanation which would exclude work-related factors as a substantial cause of the disability, or (2) directly eliminates any reasonable possibility

---

[12] *Id.* at 1011 (citing *DeNardo v. Calista Corp.*, 111 P.3d 326, 330 (Alaska 2005)).

[13] *State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 65 (Alaska 2001) (citing *Rollins v. State, Dep't of Revenue, Alcoholic Beverage Control Bd.*, 991 P.2d 202, 206 (Alaska 1999)).

[14] *Id.* at 71 (quoting *Baxley v. State*, 958 P.2d 422, 428 (Alaska 1998)).

[15] *Smith v. Univ. of Alaska, Fairbanks*, 172 P.3d 782, 788 (Alaska 2007) (citing *Bradbury v. Chugach Elec. Ass'n*, 71 P.3d 901, 905 (Alaska 2003)).

[16] *Id.*

[17] *Id.*

that employment was a factor in causing the disability."[18] If the employer rebuts the presumption, the burden shifts to the employee to prove her claim by a preponderance of the evidence.[19]

The Board applied the three-step presumption analysis to Rockstad's claim. CESS conceded that Rockstad had attached the presumption of compensability to all of her claimed conditions: right wrist de Quervain's tenosynovitis; lateral epicondylitis; medial epicondylitis; ganglion cyst; CRPS, neuritis or scar neuroma; and injury-related mood disorder. The Board decided that CESS rebutted the presumption with the opinions of its EIME physicians. Its finding about rebutting the presumption as to the de Quervain's condition was narrower than its findings about the other conditions because Dr. Fuller acknowledged that Rockstad suffered at least a temporary exacerbation of this condition because of her work at CESS.

Rockstad appears to challenge the finding that CESS rebutted the presumption of compensability, arguing that Dr. Fuller's opinions were not substantial evidence. At the second stage of the presumption analysis, the evidence is examined in isolation, without weighing it.[20] CESS's experts concluded that Rockstad did not suffer from the neurological and psychiatric conditions she claimed. They also gave the opinion that Rockstad's work was not a substantial factor in causing her ganglion cyst or medial epicondylitis. Finally, Dr. Fuller stated that any work-related exacerbation of Rockstad's tennis elbow and right de Quervain's tenosynovitis resolved by the time her employment with CESS ended. The Commission correctly determined that substantial

---

[18] *Id.*

[19] *Id.*

[20] *Stephens v. ITT/Felec Servs.*, 915 P.2d 620, 625 (Alaska 1996) (citing *Veco, Inc. v. Wolfer*, 693 P.2d 865, 869 (Alaska 1985)).

evidence in the record supported the Board's finding that CESS rebutted the presumption of compensability with its experts' opinions.[21]

In discussing the third stage, Rockstad argues that the Board erred in giving more weight to the EIME doctors' opinions than to her doctors' or the SIME doctors' opinions. Relying on *Smith v. University of Alaska, Fairbanks*,[22] she also contends that the Board did not properly evaluate the testimony of her lay witnesses.[23] Rockstad maintains that Dr. Fuller's testimony contained many contradictions and that conflicting evidence should be resolved in her favor. The Commission concluded that substantial evidence supported the Board's decision as to each condition.

We conclude that the Commission correctly decided that substantial evidence in the record supported the Board's findings. Rockstad's claim encompassed many conditions, and the Board and Commission discussed the conditions separately. There was little evidence in the record tying Rockstad's ganglion cyst to her work at CESS. Both Dr. Wilson and Dr. Fuller agreed that there was no connection. Rockstad's medial epicondylitis arose more than a year after she left her job with CESS, and there was little evidence connecting it to her work on Shemya. The EIME report and Dr. Fuller's testimony provide substantial evidence to support the Board's finding that the medial epicondylitis was not work related. Because Rockstad only visited the Shemya clinic once for lateral epicondylitis, changed jobs after her elbow complaints

---

[21]    *See Big K Grocery v. Gibson*, 836 P.2d 941, 942 (Alaska 1992) ("It has always been possible to rebut the presumption of compensability by presenting a qualified expert who testifies that, in his or her opinion, the claimant's work was probably not a substantial cause of the disability.").

[22]    172 P.3d 782 (Alaska 2007).

[23]    In addition to testifying herself, Rockstad presented the testimony of lay witnesses by deposition.

began, and did not seek treatment for her elbow again until July 2004, the Board's finding that her lateral epicondylitis "resolved after the conservative treatment initiated at Shemya Clinic in February, 2003" is supported by substantial evidence in the record.

The neurological diagnoses — CRPS, neuroma, and neuritis — were largely based on Rockstad's reports, and the Board found that she was not a credible witness.[24] As a result, it discounted these diagnoses. Additionally, the EIME reports and testimony of Dr. Fuller and Dr. Reimer are substantial evidence supporting the Board's findings. The Board gave more weight to Dr. Glass's opinion that Rockstad was malingering and did not suffer from an injury-related mood disorder than it gave to Dr. Ling's opinion, and Dr. Glass's opinion was adequate to support the Board's conclusion about Rockstad's mood disorder.

The Commission found that substantial evidence supported the conclusion that Rockstad did not prove her work with CESS was a substantial factor in causing her tenosynovitis. Dr. Fuller said that Rockstad's work with CESS caused at least a temporary exacerbation of the de Quervain's tenosynovitis. The Board found that the tenosynovitis resolved after the treatment Rockstad received in 2003. At the hearing before the Board, Dr. Fuller's testimony suggested that the work-related flare would resolve only after Rockstad stopped the repetitive motion that caused the flare. Nothing in the record suggests that Rockstad's job duties changed between the time she was first treated for de Quervain's and the time she left her job at CESS. But Rockstad's failure to return to treatment with Dr. Kase until after she left her job at Nye — almost a year after she initially consulted with Dr. Kase for wrist pain related to her CESS job — supports the conclusion that whatever increase in symptoms she experienced on Shemya resolved after conservative treatment in 2003.

---

[24] Rockstad did not ask us to review this finding.

Rockstad argues that doubt in the evidence should be resolved in her favor. We have held that inconclusive and ambiguous testimony is to be construed in favor of the applicant, but this rule generally applies at the first and second stages of the presumption analysis.[25] We have also held that this rule applies to the inconclusive testimony of a single witness, not to conflicting opinions on causation.[26] Dr. Fuller's testimony was not inconclusive. His clear opinion was that Rockstad had preexisting de Quervain's tenosynovitis, and that it was temporarily exacerbated by her job at CESS. Because of the absence of medical records after September 2003, he testified that the exacerbation ended by the time she left Shemya Island. He thought, incorrectly, that there was a gap of about six months between her work at CESS and her work at Nye, but this does not negate his opinion about when the exacerbation ended. Dr. Fuller testified that Rockstad's "symptomatic flare" ended "when she stopped coming for medical treatment," but that the condition would flare up during certain activities. He agreed that, assuming Rockstad had continuing problems until she left Shemya, "the flare [was] ongoing" while she continued the same work activities. Because Rockstad continued working at Shemya after September without seeking medical treatment, the evidence was consistent with the finding that she did not suffer a disability, even if, as the lay witnesses testified, she had some symptoms.[27] There was no evidence that Rockstad sought medical care for her right wrist from September 2003 until June 2004. Rockstad claimed that she continued to have pain, but because the Board found that Rockstad was not

---

[25] *See Smith*, 172 P.3d at 793 & n.48.

[26] *Brown v. Patriot Maint., Inc.*, 99 P.3d 544, 549-50 (Alaska 2004).

[27] *See DeYonge v. NANA/Marriott*, 1 P.3d 90, 96 (Alaska 2000) (holding that "when a job worsens an employee's symptoms such that she can no longer perform her job functions, that constitutes an 'aggravation' ").

credible, the allegation of continuing pain was given little weight. The Board had substantial evidence that any work-related exacerbation of Rockstad's de Quervain's tenosynovitis responded to the treatment she received in September 2003.

Rockstad also argues that her case is similar to *Smith*, where this court reversed a Board decision because the Board failed to evaluate critical lay testimony.[28] *Smith* is distinguishable. The Board in *Smith* did not adequately explain the weight it gave conflicting medical opinions.[29] Here, in contrast, the Board clearly assigned weight to the medical evidence and explained its decisions. The lay testimony in *Smith* was critical to the issue of causation because it was directly relevant to the doctors' assumptions about the course of the illness.[30] In Rockstad's case, CESS did not dispute that she suffered some aggravation of her de Quervain's tenosynovitis because of her work at Shemya. The lay testimony may have supported Rockstad's assertion that she suffered continuing pain from September 2003 to April 2004, but a reasonable person could conclude that the pain was not severe enough to require medical attention or cause disability because the record shows Rockstad continued to work and did not seek treatment for her wrist pain during that period. Rockstad did not consult with doctors about wrist pain until after she left her job with Nye.

Rockstad also argues that the Board erred in deciding that her right wrist de Quervain's condition preexisted her employment with CESS. But substantial evidence in the record supports this finding. Rockstad's medical records from 1999 and 2000 show similar symptoms in her right wrist, and Dr. Fuller testified that the complaints from that time were sufficient to show that she had a permanent condition.

---

[28]     172 P.3d at 789-91.

[29]     *Id.* at 791.

[30]     *Id.* at 790.

The Board found his testimony credible. The Board is empowered to weigh the evidence, including medical evidence, and this finding is supported by substantial evidence in the record.[31]

**B.    Rockstad Waived Her Challenge To The Constitutionality Of AS 23.30.122.**

Rockstad argues that AS 23.30.122 is unconstitutional.[32] Alaska Statute 23.30.122 provides:

> The board has the sole power to determine the credibility of a witness. A finding by the board concerning the weight to be accorded a witness's testimony, including medical testimony and reports, is conclusive even if the evidence is conflicting or susceptible to contrary conclusions. The findings of the board are subject to the same standard of review as a jury's finding in a civil action.

In her brief before the Commission, Rockstad raised the question of the constitutionality of AS 23.30.122; she framed her argument in the context of the right to a jury trial in a civil case. The Commission held that it lacked jurisdiction to decide whether this statute was unconstitutional.

Although the pleadings of pro se litigants are held to a less stringent standard than those of attorneys, "this relaxed standard has limits."[33] Here, we are unable to discern the legal theory Rockstad relies on to challenge the constitutionality of the statute. She appears to restate her constitutional claim about the right to a jury trial in her brief, but she cited no cases to support her argument. At oral argument before us, she

---

[31]    AS 23.30.122.

[32]    The Attorney General's office participated in this case after receiving notice pursuant to Alaska R. App. P. 514(f) that the constitutionality of AS 23.30.122 was in question.

[33]    *Thoeni v. Consumer Elec. Servs.*, 151 P.3d 1249, 1257 (Alaska 2007).

mentioned equal protection but failed to provide an argument related to that doctrine. Because Rockstad did not adequately develop her constitutional challenge to AS 23.30.122, we deem it waived.[34]

## V. CONCLUSION

Because the Commission correctly determined that substantial evidence in the record supports the Board's findings, we AFFIRM the Commission's decision.

---

[34] *Peterson v. Ek*, 93 P.3d 458, 464 (Alaska 2004).